**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 28 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ST. ANTHONY HOSPITAL,

      Petitioner,

v.

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN
SERVICES,

      Respondent.

No. 00-9529

---

**Petition for Review from a Decision of**
**The United States Department of Health and Human Services**
**(Docket No. C-98-460 - Decision No. CR620)**
**(App. Div. No. A-2000-12 (Decision No. 1728))**

---

A. Scott Johnson (Mary Hanan, Chris L. Fox, with him on the briefs), Johnson, Hanan, Heron & Trout, P.C., Oklahoma City, Oklahoma, for Petitioner.

Fran Pergericht Kuperman, Senior Counsel, (Diana L. Fogle, Senior Counsel, Edgar Bueno, Associate Counsel, with her on the brief), Special Attorneys for the U.S. Dept. of Justice, Department of Health and Human Services, Office of Counsel to the Inspector General, Washington, D.C., for Respondent.

---

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **STAGG**, District Judge.[*]

---

    [*] The Honorable Tom Stagg, U.S. District Judge for the Western District of Louisiana, sitting by designation.

**LUCERO**, Circuit Judge.

In June 2000, the Departmental Appeals Board ("DAB") of the Department of Health and Human Services upheld the imposition of a civil monetary penalty against St. Anthony Hospital for violation of the Emergency Medical Treatment and Labor Act's ("EMTALA" or "Act") "reverse-dumping" provisions. ("Reverse-dumping" occurs when a hospital emergency room refuses to accept an appropriate transfer of a patient requiring its specialized capabilities. By contrast, "patient-dumping" is the emergency-room practice of refusing to accept or treat individuals who do not have medical insurance.) St. Anthony has filed a petition to this court requesting that the agency's determination be set aside on several bases.

We are called upon to determine, among numerous other issues: should the agency have sought an expert opinion from the appropriate peer review organization ("PRO") on issues relevant to St. Anthony's liability; and applying Oklahoma agency law, did St. Anthony refuse an appropriate patient transfer? Exercising jurisdiction under 42 U.S.C. § 1320a-7a(e), we deny St. Anthony's petition.

## I

We begin by reviewing the relevant factual and procedural background.

-2-

The following facts have been taken from the Administrative Law Judge's ("ALJ") October 5, 1999 decision and other portions of the administrative record.

**A**

R.M.,[1] a sixty-five-year-old male, was involved in an automobile accident on a highway outside of Oklahoma City on April 8, 1995. At 4:50 p.m. that afternoon, he was taken to the emergency room at Shawnee Regional Hospital, a small hospital about thirty-five miles outside of Oklahoma City that lacked the ability to perform many complex medical procedures. Almost two hours later, at 6:44 p.m., Dr. Kent Thomas diagnosed R.M. with a neurological injury and arranged for his transfer to University Hospital in Oklahoma City.

At 6:50 p.m., as R.M. was boarded onto an ambulance, Dr. Carl Spengler, a third-year resident and physician at Shawnee, arrived at the emergency room as Dr. Thomas was ending his shift. In a brief conversation, Dr. Thomas told Dr. Spengler that R.M. had suffered a broken back and that his transfer to University Hospital had been arranged. En route to University Hospital, R.M.'s condition deteriorated,[2] and the ambulance was forced to return to Shawnee. In hindsight, R.M. had actually suffered from "a life-threatening traumatic injury to his

---

[1] We refer to this individual by his initials, R.M.

[2] Dr. Spengler recalled, "Just moments later, one of the paramedics comes back in and says, You need to come look at this man we just put on the ambulance. His blood pressure has dropped, and he's got real big mental status changes; he's not acting the same." (Admin. R. App. F at 345.)

abdominal aorta, the principal vessel carrying blood to the lower part of his body, which shut off the flow of blood to his lower extremities." (Admin. R. at 7.)

> Dr. Spengler then quickly examined R.M. He immediately became concerned about R.M.'s condition. R.M. was extremely cyanotic (his skin had turned blue) from his umbilicus (navel) down throughout his lower extremities. R.M. had no sensation to touch from his umbilicus down. R.M.'s skin below the umbilicus was cold, whereas it had normal appearance and temperature above the umbilicus. R.M. was complaining of back pain. He had no pulse in his femoral arteries in his legs or feet.
> Dr. Spengler had no doubt from these clinical signs and symptoms that R.M. had suffered an injury to his abdominal aorta. Dr. Spengler knew that R.M. had experienced a life-threatening injury and that the patient needed surgery. Dr. Spengler also knew that Shawnee Regional Hospital was a small country hospital that lacked the capacity to deal with the type of injury that R.M. had sustained.

(Id. at 8 (citations omitted).) Dr. Spengler determined that R.M. should be transferred because R.M. needed surgery that Shawnee could not provide.[3]

Given the circumstances, Dr. Spengler concluded that he could not then

---

[3] Dr. Spengler's testimony, cited by the ALJ in support of this proposition, was as follows:

> Q What definitive care did you believe that [R.M.] needed?
> A He needed surgery.
> Q Okay. Could you provide the surgery?
> A No.
> Q Could—why should you or wouldn't you want to see this surgery done at Shawnee?
> A Well, as far as I understood, Shawnee, to my knowledge, didn't do those surgeries.

(Id. App. F at 349–50.)

-4-

permit the ambulance to proceed to University Hospital. Dr. Spengler began

treatment to stabilize R.M.'s condition and contacted Medi-Flight, an air-

ambulance service, to transport R.M. to University Hospital, as Medi-Flight

would be a faster mode of transportation, and, in Dr. Spengler's opinion, "the

personnel on the helicopter are much more trained." (Admin. R. App. F at 352.)

Aware that Dr. Thomas had painted for University Hospital a very different

clinical picture,

> Dr. Spengler called University Hospital and spoke with that hospital's attending emergency room physician. Dr. Spengler advised that physician that R.M. had suffered damage to his aorta and that the situation was urgent. Shortly thereafter, Dr. Spengler received a call back from University Hospital. Dr. Spengler was advised that University Hospital already had two emergency surgeries to perform and that it would not be able to receive R.M..

(Admin. R. at 9 (citation omitted).) Upon being informed that University

Hospital lacked capacity to give immediate care, Dr. Spengler had a Shawnee

staff member conduct a search for another hospital. The search included a call to

St. Anthony, "a large modern hospital in Oklahoma City with state of the art

surgical facilities." (Id. at 4.)

At this point in the chronology, the facts become disputed. We proceed

utilizing the ALJ's findings. A short time later that evening, Dr. Spengler spoke

with St. Anthony emergency-room physician Dr. Billy Buffington and made a

request for a transfer.[4] After learning of R.M.'s condition, Dr. Buffington deferred to the judgment of St. Anthony's on-call thoracic and vascular surgeon, Dr. Scott Lucas.[5] The ALJ found, "Dr. Lucas and Dr. Spengler spoke by telephone after Dr. Buffington spoke with Dr. Lucas. In that conversation and in a subsequent telephone conversation with Dr. Spengler, Dr. Lucas declined Dr. Spengler's request that Dr. Lucas provide care to R.M.." (Id. at 15.) "Dr. Lucas told Dr. Spengler that he was not interested in taking R.M.'s case. He told Dr. Spengler that the case was University Hospital's problem." (Id. at 16 (citation omitted).) "Eventually, Dr. Spengler arranged the transfer of R.M. via Medi-Flight to Presbyterian Hospital in Oklahoma City." (Id. at 9.)

---

[4] As the ALJ acknowledged, evidence that a transfer was requested was in heady dispute.

[5] The ALJ concluded:

> Dr. Spengler testified credibly that, in the course of Dr. Buffington telling him that Dr. Lucas was the on-call thoracic surgeon on the evening of April 8, 1995, Dr. Buffington also told Dr. Spengler that he didn't think that Dr. Lucas would be of much help to him. [Admin. R. App. F at 358.] The clear import of Dr. Buffington's statement to Dr. Spengler was that Dr. Buffington intended to defer to Dr. Lucas' judgment as to whether R.M.'s case would be accepted at Respondent and that he doubted whether Dr. Lucas would agree to accept R.M..

(Admin. R. at 14.)

**B**

As required by 42 U.S.C. § 1395dd(d)(3), allegations that Shawnee

Regional Hospital violated the federal patient-dumping statute, EMTALA, were

referred to the appropriate PRO, the Oklahoma Foundation for Medical Quality,

Inc. The PRO afforded Shawnee Regional an opportunity for participation.

Shawnee filed a written response and submitted additional information that was

"taken into consideration in determining the outcome of the issues" before the

PRO. (Id. at 265.) Shawnee made the most of its opportunity to participate in the

PRO review, as is illustrated in the following excerpt from the PRO's January 23,

1997 findings:

> The question of whether the transfer was otherwise appropriate would appear to depend on whether the vascular surgery that [R.M.] required for further stabilization was within the capacity of Shawnee Regional Hospital to provide. According to the on call surgery list, [Shawnee physician] Dr. Howard was credentialed to perform vascular surgery and the repair of an "occluded" aorta . . . . Based on this Shawnee Regional Hospital was equipped with the staff, services, and equipment to provide the services necessary to stabilize [R.M.] by surgery. However, according to subsequent documentation received from Shawnee Regional legal representatives, Dr. Howard had not performed abdominal vascular surgery in at least one year, therefore he did not feel capable of performing such surgery. As a practical matter, therefore, according to the submitted documentation and affidavits from Shawnee Regional Hospital, they did not have the capacity to provide further stabilizing treatment in the form of vascular surgery.

(Id. at 268.)

St. Anthony was given neither reasonable notice of the PRO review nor an

opportunity to participate in the proceedings.  In January 1997, the PRO found that R.M. was critically injured and suffered from an emergency medical condition.  It further found that although R.M.'s condition was likely to deteriorate during transfer, this risk was outweighed by the benefits of the transfer.

In May 1998, the Office of the Inspector General ("OIG") notified St. Anthony that it sought to impose a $50,000 civil monetary penalty against it based "on a determination that St. Anthony Hospital failed to accept the appropriate transfer of [R.M.] on Saturday, April 8, 1995."  (Admin. R. at 162.)  St. Anthony was advised that if it wished to contest the OIG's determination, it had to file a written request for a hearing before an ALJ.  Prior to the ALJ hearing, St. Anthony moved to dismiss the agency's action on the basis that it was premature. Citing 42 U.S.C. § 1395dd(d)(3) and 42 C.F.R. § 489.24(g), St. Anthony claimed entitlement to "review by an appropriate peer review organization regarding this matter."  (Id. at 132.)  The ALJ denied this motion, concluding that St. Anthony's argument was "unsupported by the Act and regulations" (id. at 470):

> The facts as asserted by the [OIG] show that the Secretary and the [OIG] did exactly what was required by [§ 1395dd(d)(3)].  The case of R.M. was referred to the Oklahoma Foundation for Medical Quality, Inc., which is the Oklahoma PRO.  This referral was made in the context of evaluating whether the hospital which initially saw R.M. properly discharged its responsibility under [§ 1395dd(b)(1)] to stabilize R.M.'s medical condition prior to transferring R.M. to another hospital for specialized care.

-8-

(Id. (citation omitted).)  Evidently, the ALJ did not consider the applicability of 42 U.S.C. § 1320c-3(a)(16), an EMTALA-specific provision which affords hospitals subject to PRO review certain procedural rights such as the rights to receive reasonable notice and to submit additional information to the PRO.

## C

Following a hearing, the ALJ found that St. Anthony possessed the specialized capabilities and facilities, as well as the capacity, to treat R.M.  "It had on hand or available to it the qualified staff, including Dr. Lucas, necessary to provide vascular surgery to R.M.  None of Respondent's operating rooms were in use on that evening."  (Admin. R. at 22.)  On these findings, the ALJ concluded that St. Anthony, in refusing an appropriate transfer, violated the reverse-dumping provisions of EMTALA, and imposed a civil monetary penalty of $25,000.

St. Anthony appealed the initial decision of the ALJ to the DAB and again took issue with the agency's failure to satisfy EMTALA's peer-review requirements.  The DAB affirmed the imposition of a civil monetary penalty and increased the amount of the penalty to $35,000.  It overruled the ALJ's conclusion that an individual's medical stability, as defined by EMTALA, was irrelevant for purposes of determining whether St. Anthony engaged in unlawful reverse-dumping.  Although the DAB held that 42 U.S.C. § 1395dd(g) applied only when the individual to be transferred was in fact unstable, on the record before it, the

DAB deemed the ALJ's error harmless because the "ALJ . . . made underlying findings that R.M.'s emergency medical condition was not stabilized within the meaning of the Act." (Id. at 57.)

Failing to address the PRO issue, the DAB upheld the ALJ's finding regarding R.M.'s stability as supported by substantial evidence.[6] In doing so, the DAB looked, in part, to the results of the Shawnee PRO, stating, "The Oklahoma Foundation for Medical Quality, Inc. (a peer review organization), which assessed the services that R.M. received at Shawnee, concluded that '[t]he patient's condition was likely to deteriorate during transfer, but it was imperative that the patient be sent to another facility for the appropriate surgical intervention.'" (Id. at 58 (quoting id. at 267).) The DAB also cited testimony by St. Anthony expert witness Dr. John Sacra regarding Dr. Spengler's decision to arrange Medi-Flight transfer:

> [T]hat was an appropriate call on his part. He has a patient whose . . . condition has [now] worsened. The patient's been accepted by University. Medi-Flight operates through University and Children's. The patient obviously shouldn't go by ground if air transport is available, because you can speed things up, and you have a higher level of care available on the helicopter as well. You have a critical care nurse and a paramedic, and they're able to do more than most

---

[6] Under 42 C.F.R. § 1005.21(h), the DAB reviews ALJ findings of fact to see if the findings are "supported by substantial evidence on the whole record." Under this standard, the DAB must "take into account whatever in the record fairly detracts from the weight of the decision below." (Admin. R. at 49 (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).)

paramedics and [emergency medical technicians ("EMTs")].

(Id. App. F at 599–600.)

St. Anthony now brings this matter to us for review.

## II

This court is not in the business of rubber-stamping agency action.

Dickinson v. Zurko, 527 U.S. 150, 162 (1999). The applicable code provision, 42

U.S.C. § 1320a-7a(e), states that "[t]he findings of the Secretary with respect to

questions of fact, if supported by substantial evidence on the record considered as

a whole, shall be conclusive." This standard requires meaningful scrutiny of the

agency's findings. Ultimately, we ask "whether a reasonable mind might accept a

particular evidentiary record as adequate to support a conclusion." Dickinson,

527 U.S. at 162 (quotations omitted). "The substantial evidence test has been

equated to review for arbitrariness or caprice." Sternberg v. Sec'y of Health &

Human Servs., No. 01-3185, slip op. at 5 (10th Cir. Aug. __, 2002) (citing Allcare

Home Health, Inc. v. Shalala, 278 F.3d 1087, 1089 (10th Cir. 2001)).

Our review is also governed by 5 U.S.C. § 706. Under § 706(2), we may

set aside agency conclusions if they are

> (A) arbitrary, capricious, an abuse of discretion, or otherwise
> not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or
> immunity;
> (C) in excess of statutory jurisdiction, authority, or
> limitations, or short of statutory right; [or]

-11-

(D)  without observance of procedure required by law . . . .

"In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."  § 706; see All Indian Pueblo Council v. United States, 975 F.2d 1437, 1443 (10th Cir. 1992) ("The harmless error rule applies to judicial review of administrative proceedings.").  In civil cases such as this, the party challenging the action below bears the burden of establishing that the error prejudiced that party.  See Creekmore v. Crossno, 259 F.2d 697, 698 (10th Cir. 1958).

We review an agency's interpretation of a statute in its charge by applying Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron holds:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. at 842–43 (footnotes omitted).  "The judiciary is the final authority on issues

of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Id. at 843 n.9. Chevron review is appropriate for adjudicatory rulemaking. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424–25 (1999). The Supreme Court has "recognized a very good indicator of delegation meriting Chevron treatment is express congressional authorizations to engage in the process of rulemaking or adjudications that produces regulations or rulings for which deference is claimed." United States v. Mead Corp., 533 U.S. 218, 229 (2001). Such authorization is present here. See 42 U.S.C. § 1395dd(d)(1)(A); id. § 1320a-7a(c)–(m).

Review of an agency's interpretation of its own regulations is substantially deferential. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). In this context, a federal court's

> task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.

Id. (quotations and citations omitted).

**III**

Congress enacted the EMTALA as part of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, § 9121, 100 Stat. 82, 164–67 (codified as amended at 42 U.S.C. § 1395dd), to address "the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance." H.R. Rep. No. 99-241, pt. 1, at 27 (1985); see Abercrombie v. Osteopathic Hosp. Founders Ass'n, 950 F.2d 676, 680 (10th Cir. 1991). To that end, 42 U.S.C. § 1395dd(a) requires participating hospitals[7] with emergency departments to provide patients with "an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists." If the hospital determines that a patient has an emergency medical condition,[8]

---

[7] A participating hospital is one that has entered into a provider agreement under 42 U.S.C. § 1395cc. 42 U.S.C. § 1395dd(e)(2); see also Abercrombie, 950 F.2d at 680 ("COBRA applies to any hospital that receives Medicare payments and has an emergency department."). Like the vast majority of non-federal hospitals, St. Anthony is a participating hospital under the Act. See Correa v. Hosp. San Francisco, 69 F.3d 1184, 1191 (1st Cir. 1995) (stating that "ninety-nine percent of American hospitals [are] covered by EMTALA").

[8] "Emergency medical condition" is defined in 42 U.S.C. § 1395dd(e)(1):

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of

the hospital must provide either—

     (A)  within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
     (B)  for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

§ 1395dd(b)(1).  An individual who has not been stabilized may be transferred to another medical facility <u>only if</u> the transfer is an "appropriate transfer" and either the patient requests the transfer in writing or a physician certifies that the medical benefits reasonably expected from the transfer outweigh the increased risks to the individual. § 1395dd(c).[9]

---

immediate medical attention could reasonably be expected to result in—
     (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
     (ii) serious impairment to bodily functions, or
     (iii) serious dysfunction of any bodily organ or part; or
     (B) with respect to a pregnant women [<u>sic</u>] who is having contractions—
     (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
     (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

[9]  Section 1395dd(c)(1)(A)(iii) provides that "if a physician is not physically present in the emergency department at the time an individual is transferred," a transfer may nevertheless occur if "a qualified medical person . . . has signed a certification . . . after a physician . . . , in consultation with the person, has made the determination" that the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual.

In 1989, Congress imposed a corresponding duty on participating hospitals to accept "appropriate" transfers. See Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6211(f), 103 Stat. 2106, 2247–48 (codified at 42 U.S.C. § 1395dd(g)–(i)). This action came after a House of Representatives committee report found a disturbing number of

> instances in which it is necessary to transfer a patient from one hospital emergency room to another because the patient's condition requires a level of care which that hospital is unequipped to provide or because there is no physician available there who can adequately treat the patient. But often . . . the second hospital refuses to accept the transfer and treat the patient . . . .

H.R. Rep. 100-531, at 17–18 (1988). Under 42 U.S.C. § 1395dd(g), EMTALA's "nondiscrimination" provision, a participating hospital is required to accept an "appropriate" transfer of an individual requiring its specialized capabilities or facilities, so long as the hospital has the capacity to treat the individual.

In addition to private causes of action permitted under the Act, § 1395dd(d)(2)(A)–(B), EMTALA provides for civil monetary penalties against hospitals and certain physicians who have negligently violated its strictures. Except in the cases of small hospitals, the agency may impose penalties of up to $50,000 for each violation. § 1395(d)(1)(A). Enforcement duties are vested in the Department of Health and Human Services's Health Care Financing Administration ("HCFA") and the OIG. See Solicitation of Comments on the OIG/HCFA Special Advisory Bulletin on the Patient Anti-Dumping Statute, 63

-16-

Fed. Reg. 67,486, 67,486 (Dec. 7, 1998). "In fiscal year 1999, which ended Sept. 30, the OIG obtained 61 settlements and judgments under the EMTALA. Penalties were worth a combined $1,725,500." Chad Bowman, <u>Federal Penalties for Patient Dumping Rise</u>, 68 U.S.L.W. 2275, 2275 (1999).

Although a hospital's violation of EMTALA's provisions theoretically can result in the termination of that hospital's provider agreement, <u>see</u> 42 U.S.C. § 1395cc(a)(1)(I), (b)(2), termination generally does not occur in practice so long as the hospital takes corrective action. <u>See</u> Office of Inspector Gen., Dep't of Health & Human Servs., <u>The Emergency Medical Treatment and Labor Act: The Enforcement Process</u> 8 (2001). Civil monetary penalties are rare. More than half of the cases reviewed by the OIG are closed without the assessment of any penalty. <u>See</u> <u>id.</u> Many are dropped following PRO review of the allegations brought against a hospital. <u>See</u> <u>id.</u> at 16.

Aside from St. Anthony's various procedural challenges—which include a claim that the agency failed to seek appropriate PRO review—much of St. Anthony's petition questions whether 42 U.S.C. § 1395dd(g)'s nondiscrimination duty was ever triggered. In essence, St. Anthony challenges the agency's findings that

- R.M.'s emergency medical condition was unstable at the time the transfer request was made;

-17-

- Shawnee Regional Hospital would have been able to effect a transfer to St. Anthony through qualified personnel and medical equipment had St. Anthony accepted the transfer;

- St. Anthony had the specialized capability and capacity to give R.M. his needed treatment; and

- Shawnee requested to transfer R.M. to St. Anthony.

Furthermore, St. Anthony claims that even if these preconditions were met, it never refused to accept R.M.'s transfer.

**IV**

Neither party challenges the DAB's ruling that 42 U.S.C. § 1395dd(g)'s nondiscrimination duty is triggered only when the individual to be transferred suffers from an emergency medical condition that has not been stabilized.[10] This question, which we thus decline to address, is separate from the question whether the agency's factual determination on stability should be upheld. We consider the latter below.

_____

[10] See, e.g., Medicare Program; Participation in CHAMPUS and CHAMPVA, Hospital Admissions for Veterans, Discharge Rights Notice, and Hospital Responsibility for Emergency Care, 59 Fed. Reg. 32,086, 32,105 (June 22, 1994) ("The recipient hospital with specialized capabilities or facilities has an obligation under [§ 1395dd(g)] to accept a transfer if the individual has an unstabilized emergency medical condition and if the hospital has the capacity to treat the individual." (emphasis added)).

-18-

**A**

EMTALA's beneficent purpose should not obscure its inherent limitations. Section 1395dd is an anti-dumping provision, not a federal medical malpractice law.  See Bryan v. Rectors & Visitors, 95 F.3d 349, 351 (4th Cir. 1996); Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522 (10th Cir. 1994).  "Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat."  Bryan, 95 F.3d at 351.  Stabilizing treatment that hospitals must tender under the Act refers only to "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility."  42 U.S.C. § 1395dd(e)(3)(A).  EMTALA's definition of "stability" does not share the same meaning as the medical term "stable condition," which "indicates that a patient's disease process has not changed precipitously or significantly," Tabor's Cyclopedic Medical Dictionary 1861 (Clayton L. Thomas ed., 17th ed. 1993); see also Mosby's Medical, Nursing, & Allied Health Dictionary 1474 (Kenneth N. Anderson et al. eds., 4th ed. 1994) (defining "stable condition" as "a state of health in which the prognosis indicates little if any immediate change").  Under EMTALA, "[a] patient may be in a critical condition . . . and still be 'stabilized' under the terms of the Act."

-19-

Brooker v. Desert Hosp. Corp., 947 F.2d 412, 415 (9th Cir. 1991).

St. Anthony argues that in determining whether R.M. was stable, due regard should be given to the attending hospital's and physician's opinion on the matter at the time of transfer. In Cherukuri v. Shalala, the Sixth Circuit held that "a physician may transfer any emergency room patient to another hospital without any certifications and without the express consent of the receiving hospital if he reasonably believes that the transfer is not likely to cause a material deterioration of the patient's condition"—i.e., that the patient is stable. 175 F.3d 446, 450 (6th Cir. 1999) (quotation omitted); see also Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 271 (6th Cir. 1990) (stating that "neither the normal meaning of stabilization, nor any of the attendant legislative history or apparatus, indicates that Congress intended to provide a guarantee of the result of emergency room treatment and discharge").

Building upon Cherukuri, St. Anthony claims that "the testimony from the witnesses that were at RM's side in Shawnee was direct and unequivocal with regard to the legal concept of a stabilized patient under the Act." (Petitioner's Br. at 36.) The DAB rejected this argument, however, stating, "Dr. Spengler did not believe that R.M. was stabilized to the point that he could simply send R.M. to another hospital before receiving that hospital's express consent to the transfer, without violating EMTALA's transfer provisions." (Admin. R. at 61–62.) As

-20-

noted below, see infra at 30–32, EMTALA forbids the transfer of individuals with emergency medical conditions that have not been stabilized without the consent of the receiving hospital. We conclude that the agency's finding regarding R.M.'s instability is supported by substantial evidence.

The ALJ found that R.M. suffered from "a life-threatening traumatic injury to his abdominal aorta, the principal vessel carrying blood to the lower part of his body, which shut off the flow of blood to his lower extremities." (Id. at 7.) The ALJ also found that en route to University Hospital, R.M.'s condition deteriorated, forcing the ambulance to return to Shawnee. Dr. Spengler testified that although he could have permitted the ground ambulance to proceed to University Hospital, he did not do so because, in his opinion, R.M. would "have been dead before he got to the city limits." (Id. App. F at 351.)

St. Anthony's reference to Dr. Spengler's and Aaron Wade's testimony that R.M. was given stabilizing treatment prior to transfer is unavailing. (Wade was the emergency medical technician who transported R.M.) We add the DAB's conclusion:

> Contrary to what St. Anthony argued, [this testimony does] not
> conclusively show that R.M. was stabilized within the meaning of the
> Act. That is, the testimony and affidavit do not reflect that, at the
> time the statements were made, the individuals clearly understood
> that they were being asked to evaluate whether no material
> deterioration of R.M.'s emergency medical condition was likely,
> within reasonable medical probability, to result from or occur during
> a transfer. Thus, the individuals may have ascribed a different

-21-

meaning to the terms "stable" and "stabilized" when they made the statements.

(Admin. R. at 59.) In conducting our review, we will neither reweigh the evidence nor second-guess the agency's exercise of judgment. See Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994). The DAB's assessment of Dr. Spengler's and Wade's testimony is supported by substantial evidence. As we have already discussed, stability, as used in the medical profession, does not carry the same meaning as stability under EMTALA. Although Dr. Spengler testified that he understood there was a difference (Admin. R. at 4789), the citations to the record provided to us by St. Anthony do not make clear that Dr. Spengler understood the precise statutory meaning of "stability." Shortly following Dr. Spengler's testimony that R.M. was "stabilized," he stated that R.M.'s "blood pressure was still going up and down" (id. at 4790) and that Dr. Spengler was quickly "running out of tricks" to manage R.M.'s condition (id.). Dr. Spengler struggled to "buy [R.M.] more time" while the search for a hospital continued. (Id.) Wade's testimony suffered from the same deficiency.

St. Anthony claims that the DAB erroneously conducted "a de novo review of the record to justify its new factual finding that the patient was not stable for transfer." (Petitioner's Br. at 27.) According to St. Anthony, the DAB "cannot do the factual analysis which the trier of fact failed to do." (Id.) Even if this contention were true, we decline to grant relief because any such error would

-22-

have been invited by St. Anthony, which, in its brief before the DAB requested "de novo review and that [the] DAB enter findings consistent with evidence and law." (Admin. R. at 1820.) See United States v. Johnson, 183 F.3d 1175, 1178 n.2 (10th Cir. 1999) ("The invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was error.").

**B**

St. Anthony draws our attention to a troubling procedural irregularity that bears a relation to the stability issue, the agency's failure to provide St. Anthony with PRO review as contemplated by EMTALA. Even though St. Anthony was not notified of the PRO review conducted by the Oklahoma Foundation for Medical Quality, the agency nevertheless contends that EMTALA's peer-review provisions were satisfied. We disagree.

In the first years after EMTALA's enactment, the OIG regularly consulted with the appropriate PRO in evaluating alleged § 1395dd violations. See H.R. Rep. No. 101-881, at 85 (1990). This discretionary review was made mandatory in 1990, when, as a matter of law, it became "a part of the routine investigation conducted in these cases." Id. Today, EMTALA provides:

> In considering allegations of violations of the requirements of this section in imposing sanctions under [§ 1395dd(d)(1)], the Secretary shall request the appropriate utilization and quality control peer review organization (with a contract under part B of subchapter

-23-

XI of this chapter) to assess whether the individual involved had an emergency medical condition which had not been stabilized, and provide a report on its findings. Except in the case in which a delay would jeopardize the health or safety of individuals, the Secretary shall request such a review before effecting a sanction under [§ 1395dd(d)(1)] and shall provide a period of at least 60 days for such review.

42 U.S.C. § 1395dd(d)(3). Under the EMTALA-specific PRO provision, the appropriate utilization and quality control PRO

shall provide reasonable notice of the review to the physician and hospital involved. Within the time period permitted by the Secretary, the organization shall provide a reasonable opportunity for discussion with the physician and hospital involved, and an opportunity for the physician and hospital to submit additional information, before issuing its report to the Secretary under such section.

Id. § 1320c-3(a)(16). The agency's peer-review obligations are further defined by regulation, under which PRO review of an alleged § 1395dd violation must be requested "in cases where a medical opinion is necessary to determine a physician's or hospital's liability." 42 C.F.R. § 489.24(g)(1). This regulation provides for notice of the review as well as an opportunity for discussion and presentation of additional relevant information. § 489.24(g)(2). In addition, the hospital "may request a meeting with the PRO." § 489.24(g)(2)(iv). The purpose of this meeting is "to afford the . . . hospital a full and fair opportunity to present the views of the . . . hospital regarding the case." Id. The hospital "has the right to have legal counsel present during that meeting. However, the PRO may control the scope, extent, and manner of any questioning or any other presentation by the

-24-

attorney." § 489.24(g)(2)(iv)(A).  Within sixty days of receiving the case, the

PRO must submit a report with its findings to the agency, which must in turn

provide copies to the affected hospital.  § 489.24(g)(2)(v).  "The report provides

expert medical opinion regarding whether the individual involved had an

emergency medical condition, whether the individual's emergency medical

condition was stabilized, whether the individual was transferred appropriately,

and whether there were any medical utilization or quality of care issues involved

in the case."  Id.

By its terms, 42 U.S.C. § 1395dd(d)(3) requires PRO review only to assess

"whether the individual involved had an emergency medical condition which had

not been stabilized."[11]  The corresponding regulation, 42 C.F.R. § 489.24(g)(1),

adds little to this provision, stating that PRO review is requested "in cases where

a medical opinion is necessary to determine a physician's or hospital's liability."

In light of EMTALA's definition of "stability"—"stabilized" means "that no

material deterioration of the condition is likely, within reasonable medical

probability, to result from or occur during the transfer of the individual from a

facility," 42 U.S.C. § 1395dd(e)(3)(B) (emphasis added)—it is difficult to

---

[11]    The ALJ was "not persuaded that the statutory requirement of a PRO referral is an optional requirement.  The word 'shall' in [§ 1395dd(d)(3)] does not suggest discretion."  (Admin. R. at 470.)  We see no reason to disturb this conclusion.  See Chevron, 467 U.S. at 842–43.

-25-

envision a situation in which a determination regarding an individual's stability would not necessitate a medical opinion. Because the parties agree that stability of an emergency medical condition is relevant for purposes of holding a hospital liable under § 1395dd(g) and (d)(1), we must conclude that St. Anthony was entitled to PRO review.

The ALJ's conclusion to the contrary was based on its view that R.M.'s stability, or lack thereof, was irrelevant for purposes of holding St. Anthony liable. In opposing St. Anthony's motion to dismiss and later on appeal to the DAB, the OIG argued that the only issue relevant to St. Anthony's liability was whether the hospital had the capacity to treat the individual.[12] In rejecting the ALJ's view on this matter, the DAB held that § 1395dd(g)'s nondiscrimination duty is triggered only when the individual to be transferred has not been stabilized when the transfer request was made. Yet even though the DAB held that the record evidence supported a conclusion that R.M.'s emergency medical condition had not been stabilized prior to the transfer request, it failed to address any implication its conclusion would have for the ALJ's decision regarding peer

[12]   (See Admin. R. at 252 ("Once the PRO determined that Shawnee had appropriately screened, stabilized and sought to transfer [R.M.], the relevant issue regarding St. Anthony's liability became whether or not St. Anthony had the capacity and capability to manage [R.M.]."); id. at 2078 ("With the information provided from a transferring hospital, that a particular patient needs a particular type of service, the receiving hospital can only evaluate whether it can provide that service.").)

review.  Because the parties accept the DAB's decision regarding stabilization, § 1395dd(d)(3)'s mandatory peer-review provision is applicable.[13]

We disagree with the agency's suggestion that utilization of the Shawnee PRO satisfies its obligation under EMTALA.  PRO review, as mandated by EMTALA, unambiguously requires notice of the review to the hospital, as well as "a reasonable opportunity for discussion with the physician and hospital involved, and an opportunity for the physician and hospital to submit additional information."  Id. § 1320c-3(a)(16).  HCFA and the OIG apparently have taken this very position.  In a 2001 report, the OIG stated:  "According to HCFA guidelines, the PRO must offer to discuss the case with the involved physician(s) and hospital(s) and provide them with an opportunity to submit additional information."  Office of the Inspector Gen., supra, at 16 (quotation omitted).  St. Anthony was not afforded an opportunity for meaningful participation in a PRO review.[14]

It is clear to us that the agency's dereliction of its PRO obligation has the

---

[13]  Although EMTALA creates a narrow exception for cases "in which a delay would jeopardize the health or safety of individuals," 42 U.S.C. § 1395dd(d)(3), there is no contention that this exception applies in this case.

[14]  The agency suggests that St. Anthony received all of the notice it deserved because it shared a lawyer with Shawnee.  This suggestion is without merit because there is no indication that the PRO, much less St. Anthony, had any awareness that the agency was considering the idea of bringing an EMTALA claim against St. Anthony.

potential of prejudicing participating hospitals under investigation. EMTALA itself assigns the result of a PRO review a significant level of credence. Under its plain terms, 42 U.S.C. § 1395dd(d)(3) requires such review before the agency may effect a civil monetary assessment. And according to the agency's own regulations, the PRO report "provides expert medical opinion" regarding whether the individual had an emergency medical condition, whether that condition was stabilized, whether the individual was transferred appropriately, and whether there were any medical utilization or quality of care issues involved in the case. 42 C.F.R. § 489.24(g)(2)(v) (emphasis added).[15] As we have remarked, see supra at 7, the PRO's opinion carries great weight in the agency's exercise of its discretion to assess, or decline to assess, a civil monetary penalty. See Office of Inspector Gen., supra, at 16 ("In 1997, the OIG noted that in some regions the PROs disputed HCFA's decision about a case as much as 33 percent of the time.").

Potential for prejudice in cases such as this does not in and of itself justify setting aside the agency's action. It should be remembered that under 5 U.S.C. § 706, "due account shall be taken of the rule of prejudicial error." The duty of

---

[15] It is true that the ALJ held that 42 C.F.R. § 489.24(g) was inapplicable in this case. We usually give an agency's interpretation of its own regulation controlling weight "unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ., 512 U.S. at 512. On this matter, however, the ALJ operated under the assumption that stability of an emergency medical condition was irrelevant for purposes of § 1395dd(g) liability, an assumption rejected by the DAB. For this reason, we do not defer to the ALJ's holding.

establishing prejudice rests upon St. Anthony, Creekmore, 259 F.2d at 698; it falls far short of meeting its burden, arguing merely that its request for PRO review was denied and that its statutory and due process rights were violated.[16] St. Anthony makes no effort whatsoever to explain why the agency's failure to provide appropriate PRO review could not be cured by St. Anthony's presentation of evidence and expert testimony before the ALJ.

We do not overlook the evident; the DAB, in its decision that the ALJ's finding regarding stability was supported by substantial evidence considered the Shawnee PRO results. In noting that "the [OIG] offered this document into evidence only to demonstrate that a peer review organization had conducted a review of the R.M. matter," the DAB nevertheless concluded that its decision could rest on its substantive content because St. Anthony itself had "relied" on it. (Admin. R. at 58 n.8.) In a claim closely related to its separate PRO claim, St. Anthony argues that the Shawnee PRO is hearsay evidence and that reliance upon

---

[16] We note that St. Anthony does not claim that EMTALA's peer-review provisions are designed primarily to "confer important procedural benefits upon individuals in the face of otherwise unfettered discretion." Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538 (1970). It is certainly arguable that EMTALA's notice and participation requirements are designed primarily to confer procedural benefits on hospitals under investigation. However, because this matter has not been briefed, we conclude that the wisest course is to save this question for another day. See Perry v. Woodward, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (stating that this court "will not craft a party's arguments for him").

it violates its due process rights. Although the Federal Rules of Evidence generally do not apply in the agency setting, see 42 C.F.R. § 1005.17(b), the Due Process Clause of the Fifth Amendment certainly does, Bennett v. Nat'l Transp. Safety Bd., 66 F.3d 1130, 1137 (10th Cir. 1995). Under the Due Process Clause, hearsay evidence is not per se inadmissible. Id. at 1137. Nonetheless, the rule of prejudicial error resolves this claim as well. In sustaining the agency's finding that R.M. was unstable, we have excluded from our consideration the Shawnee PRO results. Relief on this ground is therefore unwarranted.

Although we are mindful that "[a] court may not uphold an agency action on grounds not relied on by the agency," Alameda Water & Sanitation Dist. v. Browner, 9 F.3d 88, 91 (10th Cir. 1993); see SEC v. Chenery Corp., 332 U.S. 194, 196 (1947), this rule does not preclude our disposition of this issue. Our decision sustaining the agency's finding on stability is based solely on grounds relied upon by the agency. In its decision, the DAB relied on a plethora of record evidence, and, based on our analysis above—excluding the PRO evidence—we are confident that the agency would have reached the same result had it considered the residual evidence alone.

## V

Given that R.M. suffered from an unstabilized emergency medical condition and that Shawnee lacked the ability to perform the complex medical

procedure needed, EMTALA imposed on Shawnee an obligation to effect an

appropriate patient transfer to another medical facility. 42 U.S.C.

§ 1395dd(b)(1)(B). An appropriate transfer under the Act is one

> (A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;
> (B) in which the receiving facility—
> (i) has available space and qualified personnel for the treatment of the individual, and
> (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;
> (C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any on-call physician (described in subsection (d)(1)(C) of this section) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;
> (D) in which the transfer is effected through qualified personnel and transportation equipment, as required[,] including the use of necessary and medically appropriate life support measures during the transfer; and
> (E) which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

§ 1395dd(c)(2). Section 1395dd's nondiscrimination provision mandates that "[a]

participating hospital that has specialized capabilities or facilities . . . shall not

refuse to accept an appropriate transfer of an individual who requires such

specialized capabilities or facilities if the hospital has the capacity to treat the individual." § 1395dd(g).

St. Anthony suggests that it cannot be held liable for violating § 1395dd(g) unless each of § 1395dd(c)(2)'s requirements was satisfied. This contention is a bit numbing, for there can be no "appropriate transfer," as the term is defined in § 1395dd(c)(2), if the receiving facility has not "agreed to accept transfer of the individual and to provide appropriate medical treatment," § 1395dd(c)(2)(B)(ii). St. Anthony's suggestion would lead to an absurd result, as the requirement that the hospital must accept a transfer under § 1395dd(g) would be nullified by the hospital's refusal to accept.

Two narrower arguments are also advanced by St. Anthony: that Shawnee could not have arranged a transfer to St. Anthony that was "effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer," § 1395dd(c)(2)(D); and that the evidence does not support the agency's finding that it had the specialized capability and capacity to treat R.M.

**A**

Supporting the first of the foregoing propositions, St. Anthony argues there was no appropriate transfer because "Mediflight had no arrangement on April 8, 1995, which allowed Mediflight to fly RM" to St. Anthony. (Petitioner's Br. at

14.) Rejecting this claim, the DAB held:

> We conclude that substantial evidence on the whole record supports the ALJ's finding that Shawnee would have effected a transfer of R.M. to St. Anthony through qualified personnel and medical equipment had St. Anthony accepted the transfer request. Both the I.G.'s and St. Anthony's expert witnesses provided testimony supporting the ALJ's finding that transporting R.M. by a helicopter ambulance "was the only appropriate way to have transported R.M. given his emergency condition." [Admin. R. at 25.] As the ALJ noted, the Medi-Flight paramedics were highly qualified and the transportation was much quicker than ground ambulance. Id. Further, though Medi-Flight did not have a contract to land at St. Anthony, Aaron Wade, the Medi-Flight employee who attended to R.M. on the night in question, testified that he believed his supervisor, Dennis Martin, would have granted the clearance to land at St. Anthony under the circumstances. [Admin. R. App. F at 458–59, 481.] In addition, Dennis Martin himself testified that he would have authorized the Medi-Flight pilot to land at St. Anthony. I.G. Ex. 44 at 16–18. Moreover, I.G. exhibits 35 and 36 demonstrate that Medi-Flight has, in unusual circumstances, flown to hospitals with which it has had no contract, including St. Anthony.

(Admin. R. at 102–03.) Having reviewed the administrative record, we conclude that the agency's finding was supported by substantial evidence.

**B**

As for the second proposition—regarding the agency's finding on specialized capability and capacity—St. Anthony asserts a misplaced evidentiary burden as well as inadequacy of evidence. Title 42 U.S.C. § 1395dd does not define the term "capacity," but the agency has promulgated a regulatory definition. Under 42 C.F.R. § 489.24(b),

> Capacity means the ability of the hospital to accommodate the

-33-

individual requesting examination or treatment of the transferred individual. Capacity encompasses such things as numbers and availability of qualified staff, beds and equipment and the hospital's past practices of accommodating additional patients in excess of its occupancy limits.

A closely related term in § 1395dd is "specialized capability." The ALJ concluded that "Congress intended th[is] term to encompass those capabilities and facilities which enable a hospital to offer specialized care that is not offered by hospitals that are less well-endowed," i.e., the transferring hospital. (Admin. R. at 21.)

St. Anthony does not take issue with either of these definitions. Instead, it claims first that the agency misplaced upon it the burden of disproving capacity, and second that there is insufficient evidence that it "had capacity/capability to treat RM" (Petitioner's Br. at 43). We consider these claims in reverse order.

We conclude that the agency's finding regarding capability and capacity is supported by substantial evidence. St. Anthony's characterization of the record evidence—that there is no evidence of its capability to treat R.M.—is strained. Substantial evidence supports the following facts: St. Anthony's nineteen surgical suites were unoccupied on April 8, 1995; St. Anthony had "the equipment on hand to do the necessary surgery"; physicians were on call for emergencies in a number of areas, including neurology, general surgery, and thoracic surgery; and "Dr. Lucas is a specialist who is adept at performing the delicate emergency

-34-

vascular surgery that R.M. required." (Admin. R. at 21.)

Moreover, the record reflects that the surgery to be performed on R.M. could not be performed at Shawnee—a "small, country hospital" (Admin. R. App. F at 347)—without undue risk. As the ALJ found,

> Shawnee Regional Hospital lacked the capabilities and the facilities which were needed by R.M.. The surgery that R.M. required necessitated the presence of a trained vascular surgeon. The on-call surgeon for Shawnee Regional Hospital on the evening of April 8, 1995 had not performed any vascular surgeries for 8 to 10 years prior to that date. In 1993, he advised Shawnee Regional Hospital that he would no longer perform vascular surgeries. The surgery required by R.M. necessitated the availability of other services which Shawnee Regional Hospital lacked including state of the art operating facilities.

(Admin. R. at 21 (citations omitted).)[17]

In its exceptions to the ALJ's decision, St. Anthony took issue with the ALJ's finding that it had capacity to treat R.M., specifically stating:

> [T]he ALJ could not find that [St. Anthony] had the capacity to treat RM unless: (1) [St. Anthony] had the ability to accommodate RM's **requested** examination or treatment on April 8, 1995; (2) [St. Anthony] had the qualified staff available on April 8, 1995 to treat RM; (3) [St. Anthony] had the necessary beds available on April 8, 1995 to accommodate RM; and (4) [St. Anthony] had all of the

---

[17] The agency concluded that the availability on-call physicians may be taken into account in determining whether a receiving hospital has specialized capabilities and capacity for purposes of 42 U.S.C. § 1395dd(g). EMTALA does not speak directly on this issue, but it does state that an on-call physician may be liable under the Act for refusing to appear to treat a patient. § 1395dd(d)(1)(C). Because the agency's interpretation is reasonable and EMTALA does not foreclose it, it easily passes <u>Chevron</u> review.

necessary equipment available on April 8, 1995 to treat RM.

(Id. at 1700–01.)  Evidence of the number of operating rooms available, the availability of a thoracic surgeon, and the availability of an anesthesiologist on April 8, 1995, St. Anthony tells us, was insufficient to prove capacity.  This evidence, St. Anthony contends, "does not make reference to any other suites, staff, or equipment that was available at St. Anthony on April 8, 1995."  (Id. at 1701.)

Addressing this exception, the DAB concluded that St. Anthony parsed the evidence too finely and that "the ALJ was not required to make individualized findings that each piece of equipment necessary to perform the surgery that R.M. required was on hand during the evening at issue."  (Id. at 71.)  The DAB observed in a footnote that St. Anthony was free to rebut—"as an affirmative defense"—the agency's evidence with any "information about the availability of additional suites, staff and equipment at its facility on the night in question" that it might have.  (Id. at 71 n.14.)

We agree with St. Anthony that the agency bore the burden of proving this element of the § 1395dd(g) violation.  See 42 C.F.R. § 1005.15.  Contrary to St. Anthony's assertion, however, the challenged footnote does not place upon it the burden of disproving capacity.  Rather, it asserts that substantial evidence supported the agency's determination—a conclusion with which we agree—and

the fact that St. Anthony failed to come forward with any contrary evidence forecloses its claim.[18]

## VI

Section 1395dd(g) cannot be violated if a transfer was neither requested nor refused. St. Anthony claims that it cannot be held liable because (1) there is "no factual support" for the proposition that Dr. Spengler made a request (Petitioner's Br. at 41) and (2) "neither SAH nor its agents refused a transfer request" (id. at 46).

---

[18] In a similar argument, St. Anthony claims that "[t]he DAB switched the burden of proof requiring SAH to disprove the ability to pay" in calculating the civil monetary penalty ("CMP"). (Petitioner's Br. at 28.) Under 42 C.F.R. § 1003.106(a), petitioner's financial condition is a relevant circumstance considered in assessing such penalty. The DAB held:

> St. Anthony did not cite to any authority in support of its assertion that the burden of proof on this item rests with the [OIG], and we know of none. St. Anthony was given the opportunity to provide information about this and the other factors taken into account by the [OIG] in setting the amount of the CMP in the May 14, 1998 letter proposing imposition of the $50,000 amount. There is nothing in the record showing that it did so. . . . Indeed, although St. Anthony is in the best position to present evidence as to whether it lacks the financial ability to pay the CMP, even when it was proposed at the maximum amount, it has never made so much as an allegation to that effect. Consequently, since this exception is utterly devoid of any legal or factual basis, we affirm the ALJ's finding.

(Admin. R. at 117 (citation omitted).) The DAB's conclusion does not constitute reversible error. In fact, 42 C.F.R. § 1005.15(b)(1) provides that St. Anthony bore "the burden of going forward and the burden of persuasion with respect to affirmative defenses and any mitigating circumstances" (emphasis added).

"No one ever testified in this case that [Dr.] Spengler requested a transfer of RM to SAH," St. Anthony argues. (Id. at 41.) The ALJ acknowledged:

> The record does not contain the precise words that Dr. Spengler uttered to Dr. Buffington. But, the gist of what Dr. Spengler said to Dr. Buffington is clear. The plain meaning of Dr. Spengler's statements to Dr. Buffington is that R.M. was suffering from an emergency condition that needed to be treated immediately with surgery and that Dr. Spengler was seeking to transfer R.M. to Respondent so that the surgery could be performed there by Respondent's on-call thoracic surgeon.

(Admin. R. at 11.) St. Anthony's argument on this issue is simply too ambitious. Rather than refuting the facts relied upon by the ALJ in its determination, St. Anthony claims that the agency failed to "present a scintilla of evidence" on this issue. (Petitioner's Br. at 42.) This contention is plainly without merit and does not warrant further discussion.

## A

Before we proceed to our review of the agency's findings with respect to whether St. Anthony refused R.M.'s transfer, a brief summary of applicable agency law is in order. We assume, as the parties have, that Oklahoma state law should apply.

As with any corporation, a hospital can act only through its officers and agents. See Magnolia Petroleum Co. v. Davidson, 148 P.2d 468, 471 (Okla. 1944). A principal-agent relationship may be grounded in a formal arrangement or may be inferred from "conduct which shows that one is willing for the other to

-38-

act for it, subject to its control, and that the other consents so to act." Bank of Okla. v. Briscoe, 911 P.2d 311, 317 (Okla. Ct. App. 1996); see Restatement (Second) of Agency § 1 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."). "'It is not necessary that the parties intend to create the legal relationship or to subject themselves to the liabilities which the law imposes upon them as a result of it.'" Bank of Okla., 911 P.2d at 317 (quoting Farmers Nat'l Grain Corp. v. Young, 102 P.2d 180, 185 (Okla. 1940)).

St. Anthony relies heavily on the agency's finding that St. Anthony "never formally vested Dr. Lucas with the authority to decide on [its] behalf whether to accept or reject a requested transfer" (Admin. R. at 27). Its preoccupation with this finding seems to us unjustified because, as we have just stated, the absence of a formal relationship does not preclude a finding that an agency relationship exists. The hospital also expends much of its energy seeking to negate the existence of apparent authority. It is well-settled that a principal may, in some cases, be liable for the acts of individuals acting with apparent authority:

> "Apparent authority" of an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing. And the elements that must be present before a third person can hold the principal for the acts of the agent on the theory of apparent authority are (a) conduct of the principal, (b) reliance thereon by the third person, and (c) change of position by

the third person to his detriment.

Stephens v. Yamaha Motor Co., 627 P.2d 439, 441 (Okla. 1981) (quotation

omitted). "The existence of actual authority between principal and agent is not a

prerequisite to establishing apparent authority." Id.

We need not decide whether the agency's finding that St. Anthony refused

Shawnee Regional Hospital's request can be sustained applying apparent authority

principles because there is substantial evidence to support the existence of actual

authority in this case.[19] St. Anthony concedes that Dr. Buffington had actual

authority to accept or refuse R.M.'s transfer. (Petitioner's Br. at 47.) This

concession appears apt considering that the ALJ found:

> [I]n the course of Dr. Buffington telling [Dr. Spengler] that Dr.
> Lucas was the on-call thoracic surgeon on the evening of April 8,
> 1995, Dr. Buffington also told Dr. Spengler that he didn't think that
> Dr. Lucas would be of much help to him. [Admin. R. App. F at 358.]
> The clear import of Dr. Buffington's statement to Dr. Spengler was
> that Dr. Buffington intended to defer to Dr. Lucas' judgment as to
> whether R.M.'s case would be accepted at [St. Anthony] and that he
> doubted whether Dr. Lucas would agree to accept R.M..
>   . . .
>     Dr. Buffington's deference to Dr. Lucas on the issue of
> whether Dr. Lucas would provide care to R.M. also is made clear by
> what Dr. Buffington disclosed in his April 11, 1996 interview about
> his telephone conversation with Dr. Lucas on the evening of April 8,

---

[19]  St. Anthony states that "[t]he party asserting agency bears the burden of establishing its existence by 'clear and satisfactory evidence.'" (Petitioner's Br. at 50 (quoting In re Branding Iron Motel, Inc., 798 F.2d 396, 401 (10th Cir. 1986)). The case relied upon for this proposition, In re Branding Iron Motel, is inapplicable here because it applies Kansas, not Oklahoma, law.

1995. I.G. Ex. 6 at 21, 22. After speaking with Dr. Spengler, Dr. Buffington spoke to Dr[.] Lucas. Dr. Lucas told Dr. Buffington that he would likely not be taking R.M.'s case. Id. Dr. Lucas began to instruct Dr. Buffington as to what to tell Dr. Spengler. Id. However, he changed his mind and told Dr. Buffington that he would call Dr. Spengler directly. Id.

Dr. Buffington did not tell Dr. Lucas at that point that Dr. Lucas lacked the authority to decide whether or not to take R.M.'s case. See I.G. Ex. 6 at 21, 22. Nor did Dr. Buffington remind Dr. Lucas of his obligation as Respondent's on-call thoracic and vascular surgeon to take any case that Dr. Buffington concluded would require Dr. Lucas' services. [See id.]

(Admin. R. at 14–15.) These findings have ample support in the administrative record, and therefore, we have no trouble concluding that Dr. Buffington effectively refused to accept R.M.'s transfer, permitting Dr. Lucas to communicate this fact to Shawnee Regional Hospital. Because Dr. Buffington had actual authority to refuse the transfer, we hold St. Anthony bound by the refusal.[20]

---

[20] We read the DAB's decision as resting on the alternate grounds of actual and apparent agency. With respect to the former, the DAB stated:

[T]he ALJ did not err as a matter of law in holding St. Anthony responsible for denying the transfer request based on the actions, statements and omissions of Drs. Buffington and Lucas. . . . [A] hospital may be held responsible for violating [§ 1395dd(g)] if an individual to whom the hospital has assigned the responsibility to determine whether to accept a transfer request denies a request for an appropriate transfer under [§ 1395dd(g)].

(Admin. R. at 90.) "Further," said the DAB, the ALJ's decision could also be sustained "under the well-settled principle of apparent or ostensible agency." (Id.) Finally, the DAB held:

**B**

St. Anthony contends that Shawnee informed St. Anthony that "other arrangements had been made," and that this amounts to the withdrawal of the transfer request. Because the referenced communication occurred after St. Anthony refused to accept R.M.'s transfer, this contention offers St. Anthony no hope for relief. By that time the § 1395dd(g) offense was complete.

Once University Hospital accepted the original transfer request, R.M. became University's patient as a matter of law, St. Anthony argues. Thus, claims St. Anthony, it is absolved of any liability under § 1395dd. St. Anthony relies on an unpublished district court case which quotes 42 C.F.R. § 489.24 for the proposition that, for EMTALA purposes, an individual "comes to the emergency room department" if "'[t]he individual is on the hospital property (property includes ambulances owned and operated by the hospital, even if the ambulance is

---

In light of the foregoing principles of agency law and the discretion that EMTALA grants hospitals to assign the responsibility to respond to transfer requests, we conclude that the ALJ did not err in determining that the actions, statements and omissions of Drs. Buffington and Lucas constituted a refusal by St. Anthony of Shawnee's request to transfer R.M. As the ALJ found, Dr. Buffington, whom St. Anthony itself acknowledged was an agent of the hospital, indicated to both Dr. Spengler and Dr. Lucas that it would be up to Dr. Lucas whether or not R.M. would be treated at St. Anthony.

(Id. at 91 (quotation and brackets omitted).)

not on hospital grounds) . . . .'" Madison v. Jefferson Parish Hosp. Serv. Dist. No. 1, Civ. A. No. 93-2938, 1995 WL 396316, at *2 (E.D. La. June 30, 1995) (quoting 42 C.F.R. § 489.24(b)). Under EMTALA, a hospital's screening duty kicks in only when the individual "comes to the emergency department," § 1395dd(a), and based on the regulatory definition of this phrase, there can be no doubt that Shawnee owed R.M. an appropriate medical screening. However, this language in no way supports St. Anthony's argument that it is absolved of § 1395dd(g) liability by virtue of R.M.'s having been boarded onto a University Hospital ambulance at one point on April 8, 1995. EMTALA's screening provisions are not at issue in this case, and, to put matters simply, this argument is not relevant.

## C

Even if we accept the contested proposition that St. Anthony refused R.M.'s transfer, St. Anthony argues that due regard should be given to Dr. Lucas's purported exercise of medical judgment. The agency agrees with the general proposition that

> the exercise of medical judgment indeed plays a role in determining
> whether a transfer is appropriate, but [believes] it should be
> addressed through the criteria already established by Congress at
> [§ 1395dd(c)]. Thus, when analyzing whether a transfer was
> appropriate, an adjudicator should consider whether the physicians
> involved in the transfer exercised medical judgment in deciding not
> only that the benefits expected from the transfer did or did not
> outweigh the risks to the patient, but also that each of the applicable

criteria listed at [§ 1395dd(c)(2)] was, or was not, met. Accordingly, in the context of a [§ 1395dd(g)] case, it is appropriate to consider the informed medical judgment of both the transferring physician(s) and potential receiving physician(s). We note that as a practical matter, however, any hospital with specialized capabilities or facilities that refuses a request to transfer an unstabilized patient risks violating [§ 1395dd(g)] to the extent that it chooses to second-guess the medical judgment of the transferring hospital.

(Admin. R. at 105.) "[R]eject[ion] on factual grounds [of] St. Anthony's contention that Dr. Lucas exercised sound medical judgment" (id.) by the ALJ was the predicate for the agency's decision regarding Dr. Lucas's medical judgment. The DAB:

> That is, the ALJ found not to be credible Dr. Lucas' hearing testimony that Dr. Spengler reported incorrect information about R.M.'s condition, leading Dr. Lucas to conclude that R.M. was a "multi-trauma" patient, and that, consequently Dr. Lucas was not capable of treating R.M. As we discussed above, the ALJ's determination as to Dr. Lucas' lack of credibility is supported by inferences reasonably drawn from the evidence of record.

(Id.) St. Anthony gives us no reason to question this credibility determination, and thus, we will not disturb it.

While we are on the subject of medical judgment, however, one point warrants further discussion. This court has stated that EMTALA's private cause of action, codified at 42 U.S.C. § 1395dd(d)(2)(A), is a "strict liability" provision. Abercrombie, 950 F.3d at 681. Placing Abercrombie in its proper context, we later held that strict liability attaches only if the hospital is shown to have known of the existence of a necessary fact—e.g., that the patient suffered

from an emergency medical condition.  Urban v. King, 43 F.3d 523, 525–26 (10th Cir. 1994).  Provisions sanctioning the agency's imposition of a civil monetary assessment state that a "participating hospital that negligently violates a requirement of this section is subject to a civil money penalty."  42 U.S.C. § 1395dd(d)(1)(A) (emphasis added).[21]  It stands to reason that a hospital may be subject to a civil monetary assessment only if it knew or should have known of the existence of an emergency medical condition, that the emergency medical condition was not stabilized, and that the hospital had the capacity to treat the individual.  Cf. Burditt v. United States Dep't of Health & Human Servs., 934 F.2d 1362 (5th Cir. 1991).  Consistent with this, we reject St. Anthony's contention that EMTALA's negligence standard requires a determination that a hospital or physician breached a standard of care.

## VII

St. Anthony challenges the agency's determination on a number of other grounds.  The hospital claims that the "OIG failed to meet its burden of proof on damages" (Petitioner's Br. at 45); the agency erroneously denied its motion for summary judgment; it failed to provide reasonable notice of the claims against St.

---

[21]  As originally enacted, § 1395dd(d)(2) provided for imposition of a civil monetary penalty only if the hospital "knowingly" violated a requirement of that section.  In 1990, Congress amended EMTALA to provide for such penalties in cases of negligent violations of the statute.

Anthony; it failed to follow its own rules in "allowing an untimely . . . cross-appeal" by the OIG (id. at 26); and it denied St. Anthony a fair hearing. We now consider each of these claims.

**A**

Relying on the ALJ's post-hearing statement that the parties had not "talked about the amount of a civil money penalty, not one word" (Admin. R. App. F at 929), St. Anthony claims that the monetary penalty assessed against it has no evidentiary support and should be dismissed. Whether the amount of a penalty was explicitly discussed during the hearing is distinct from the question before us—whether the agency's imposition of a $35,000 penalty is supported by the evidence. St. Anthony does not discuss the evidence cited by the ALJ and the DAB, and we therefore do not reverse on this claim. See Perry v. Woodward, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999).

**B**

Title 42 C.F.R. § 1005.4(b)(12) allows an agency to, "[u]pon motion of a party, decide cases, in whole or in part, by summary judgment where there is no disputed issue of material fact." In this circuit, the summary-judgment procedure is not intended to be a device planted in early stages of litigation delay-set to explode on appeal. Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251 (10th Cir. 1992) (citing Holley v. Northrop Worldwide Aircraft Serv., 835 F.2d 1375,

-46-

1377–78 (11th Cir. 1988)). Whalen holds that "even if summary judgment was erroneously denied, the proper redress would not be through appeal of that denial but through subsequent motions for judgment as a matter of law . . . and appellate review of those motions if they were denied." 974 F.2d at 1251. In a later case, we limited Whalen's application to determinations of "genuine issue of material fact." See Ruyle v. Cont'l Oil Co., 44 F.3d 837, 842 (10th Cir. 1994). That is precisely what is at issue here. (Petitioner's Br. at 22.)

Applying this principle to the present case, we conclude that the proper recourse for a party after an erroneous denial of a motion for summary judgment by an agency is not to appeal that denial, but to "[s]ubmit written briefs and proposed findings of fact and conclusions of law" after the evidentiary hearing conducted by the ALJ, 42 C.F.R. § 1005.3, followed by an appeal of the ALJ's findings of fact and conclusions of law to the DAB, see id. § 1005.21. The DAB reviews findings of fact to determine whether the decision "is supported by substantial evidence on the whole record. The standard of review on a disputed issue of law is whether the initial decision is erroneous." Id. The decision of the DAB is then subject to review by this court. See 42 U.S.C. § 1320a-7a(e).

## C

Due process requires that a party to an administrative proceeding be reasonably notified of the issues in controversy and not be misled. Rapp v.

-47-

United States Dep't of Treasury, 52 F.3d 1510, 1520 (10th Cir. 1995); see also 5 U.S.C. § 554.  In Long v. Board of Governors, 117 F.3d 1145 (10th Cir. 1997), this court stated:

> Section 554 of the Administrative Procedure Act requires procedural fairness in the administrative process.  Rapp v. United States Dept. of Treasury, 52 F.3d 1510, 1519 (10th Cir. 1995).  According to 5 U.S.C. § 554(b)(3) (1994), an individual entitled to notice of an agency hearing must "be timely informed of . . . the matters of fact and law asserted."  However, "[a]s long as a party to an administrative proceeding is reasonably apprised of the issues in controversy, and is not misled, the notice is sufficient."  Savina Home Indus., Inc. v. Secretary of Labor, 594 F.2d 1358, 1365 (10th Cir. 1979); Rapp, 52 F.3d at 1520.  To establish a due process violation, an individual must show he or she has sustained prejudice as a result of the allegedly insufficient notice.  Rapp, 52 F.3d at 1520; Abercrombie v. Clarke, 920 F.2d 1352, 1360 (7th Cir. 1990), cert. denied, 502 U.S. 809 (1991).

Long, 117 F.3d at 1158.

On May 14, 1998, St. Anthony was notified by letter that the OIG sought to impose upon it a civil monetary penalty of $50,000 pursuant to 42 U.S.C. § 1395dd(d)(1).  After summarizing the substantive provisions of § 1395dd, the OIG stated that it was authorized to impose a civil penalty of up to $50,000 for negligent violation of the section.  The OIG cited 42 C.F.R. §§ 1003.102(c)(1)(i)(B), 1003.103(e)(1)(iii), and 1003.106(a)(4).  Section 1003.106(a)(4) sets forth criteria to be applied in determining the appropriate civil monetary penalty, the first of which is the culpability of the participating

hospital.[22]

In its decision of October 5, 1999, the ALJ concluded, "There is evidence in this case which relates to the criteria for deciding the amount of a civil money penalty that are stated at 42 C.F.R. § 1003.106(a)(4)." (Admin. R. at 33.) However, the ALJ disagreed "with the way in which the [OIG] seeks to assess culpability." (Id. at 35.)

> The question I must decide is not the degree of culpability of Drs. Buffington and Lucas but the degree of culpability of Respondent. That is measured not by Dr. Buffington's and Dr. Lucas' actions and motivations on the evening of April 8, 1995 so much as it is measured by Respondent's actions to attain or not to attain compliance with the requirements of [§ 1395dd(g)].
>
> Respondent was not motivated as a matter of policy to deny a transfer to R.M. or to deny an appropriate transfer to anyone else. Respondent's policy was to comply with the requirements of [§ 1395dd(g)]. Respondent's fault on the evening of April 8, 1995 lies in its failure to insure that its policy was enforced. That is an act of misfeasance by Respondent and not of malfeasance.

_____

[22] The criteria are:

(i)  The degree of culpability of the respondent;
(ii)  The seriousness of the condition of the individual seeking emergency medical treatment;
(iii)  Any other instances where the respondent failed to provide appropriate emergency medical screening, stabilization and treatment of individuals coming to a hospital's emergency department or to effect an appropriate transfer;
(iv)  The respondent's financial condition;
(v)  The nature and circumstances of the violation; and
(vi)  Such other matters as justice may require.

42 C.F.R. § 1003.106(a)(4).

(Admin. R. at 35 (citation omitted).) Relying in part on this rationale, the ALJ concluded that St. Anthony should be assessed a $25,000 penalty rather than the $50,000 penalty sought by the OIG. (Id. at 38.)

St. Anthony claims that the OIG "never gave notice of a charge of failure to maintain adequate EMTALA policies, a charge falling under a completely different statute, 42 U.S.C. § 1395cc(a)(1)(I)(i)." (Petitioner's Br. at 23.) Section 1395cc(a)(1)(I)(i) requires participating hospitals to file with the secretary an agreement "to adopt and enforce a policy to ensure compliance with the requirements of [42 U.S.C. § 1395dd] and to meet the requirements of such section." In light of this failure to charge, St. Anthony contends, the ALJ could not—consistent with St. Anthony's due process and statutory rights—"use[] inadequate policies as the basis for liability and to raise the fine against SAH." (Petitioner's Br. at 23–24.)

St. Anthony's argument is based on the faulty premise that the ALJ held it liable for a violation of § 1395cc(a)(1)(I)(i). To the contrary, the ALJ merely considered St. Anthony's "failure to insure that its policy was enforced" as a means of determining St. Anthony's culpability under 42 C.F.R. § 1003.106(a)(4)(i). The OIG's May 14, 1998 letter fully apprised St. Anthony that its culpability was in controversy, stating:

> In determining the amount of penalty to impose pursuant to
> [§ 1395dd], I have considered the following factors as specified in 42

C.F.R. § 1003.106(a)(4).

      First, I have considered the hospital's degree of culpability and found it to be substantial. St. Anthony Hospital was aware of the critical condition of [R.M.] and the need for his transfer. The hospital's on-call physician refused to come in to perform surgery on this multiple trauma patient. St. Anthony Hospital had both the capacity and capability to treat [R.M.] on April 8, 1995. St. Anthony Hospital inappropriately permitted the on-call physician to make the final decision for the hospital as to whether or not the hospital would accept this patient.

(Admin. R. at 162.)

Moreover, the ALJ's conclusion that St. Anthony's failure to enforce its § 1395dd policy was relevant to the culpability determination easily passes muster. "[T]he agency's interpretation [of its own regulation] must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ., 512 U.S. at 512 (quotation omitted).

      Substantive review of an agency's interpretation of its regulations is governed only by that general provision of the Administrative Procedure Act which requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). It falls well within this text to give the agency the benefit of the doubt as to the meaning of its regulation.

Allentown Mack Sales & Serv. Inc. v. NLRB, 522 U.S. 359, 377 (1998). The ALJ's conclusion was neither plainly erroneous nor inconsistent with 42 C.F.R. § 1003.106(a)(4) and will not be reversed.

**D**

St. Anthony claims that the DAB failed to follow its own rules in "allowing

-51-

an untimely [OIG] cross-appeal which was used to increase the fine."

(Petitioner's Br. at 26.)  It cites United States v. Nixon, 418 U.S. 683 (1974), for

the proposition that an agency is obliged to follow its own rules.  This premise is

no doubt true.  It is not this court's place, however, to interpret the agency's

procedural rules de novo.  See Bar MK Ranches v. Yuetter, 994 F.2d 735, 738

(10th Cir. 1993).  The agency's interpretation of the relevant regulations passes

the deferential standard we apply on review.

> Pertinent to our consideration is 42 C.F.R. § 1005.21(a):
>
> Any party may appeal the initial decision of the ALJ to the DAB by
> filing a notice of appeal with the DAB within 30 days of the date of
> service of the initial decision.  The DAB may extend the initial 30
> day period for a period of time not to exceed 30 days if a party files
> with the DAB a request for an extension within the initial 30 day
> period and shows good cause.

The notice of appeal must be accompanied by a brief "specifying exceptions to

the initial decision and reasons supporting the exceptions."  § 1005.21(c).  Any

party may file a brief opposing these exceptions "which may raise any relevant

issue not addressed in the exceptions" within thirty days of the notice of appeal.

Id.  The DAB is empowered to "decline to review the case, or may affirm,

increase, reduce, reverse or remand any penalty, assessment or exclusion

determined by the ALJ."  § 1005.21(g).

After the DAB granted it an extension, St. Anthony filed a timely notice of

appeal and written brief specifying exceptions to the ALJ's October 5, 1999

-52-

decision. "Among its exceptions, St. Anthony Hospital contended that the civil money penalty of $25,000 assessed by the [ALJ] . . . was not 'reasonable in light of the evidence which relates to the factors used to decide the amount of civil money penalty and in light of the Act's penal purpose.'" (Admin. R. at 2134 (quoting Admin. R. at 1772).)

The DAB also granted the [OIG] an extension of time to file its response brief. On February 14, 2000, the OIG did so. Included in the OIG's submission were documents entitled "Inspector General's Notice of Cross-Appeal" and "Inspector General's Brief in Support of its Cross Appeal." (Id. at 2134.) "In her brief supporting the 'Cross-Appeal,' the [OIG] argued that the ALJ erred in failing to assess a maximum civil money penalty of $50,000, and the [OIG] specifically responded to St. Anthony's Exception 13." (Id.)

St. Anthony complains that the inspector general's "cross-appeal" was untimely and should have been stricken. This untimeliness, contends St. Anthony, deprived the DAB of authority to increase the assessment from $25,000 to $35,000. Under the Federal Rules of Appellate Procedure, the court of appeals obtains jurisdiction over a case only upon the timely filing of a notice of appeal or cross-appeal. See Smith v. Barry, 502 U.S. 244, 245 (1992); Shearson Lehman Bros., Inc. v. M & L Invs., 10 F.3d 1510, 1511 n.1 (10th Cir. 1993). Yet, the Federal Rules of Appellate Procedure are not at issue here. Rather, St. Anthony

-53-

seeks review of the agency's interpretation of its own regulations. We reiterate

that "the agency's interpretation must be given controlling weight unless it is

plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ.,

512 U.S. at 512 (quotation omitted).

Relying on the text of 42 C.F.R. § 1005.21, the DAB concluded that the

government's submission—though denominated a "cross-appeal"—was an

acceptable one. As stated above, § 1005.21(c) permits any party to file a brief

opposing another party's exceptions "which may raise any relevant issue not

addressed in the exceptions." The DAB characterized the "cross-appeal" as

follows:

> That is, in substance this document replied to an issue that St.
> Anthony Hospital specifically raised in its appeal—the amount of the
> civil money penalty imposed by the ALJ. Moreover, even if St.
> Anthony had not raised the issue in its appeal, the [OIG's]
> submission would nevertheless be permissible because it specifically
> addressed factual findings and legal conclusions in the ALJ decision
> concerning the civil money penalty assessed, and thereby "raised a
> relevant issue" in the case.

(Admin. R. at 2134 (brackets omitted).) This conclusion is neither plainly

erroneous nor inconsistent with the applicable regulations. We therefore sustain

the DAB's decision regarding the OIG's February 14, 2000 submission.

**E**

One of the more serious allegations made by St. Anthony is that it was

denied a fair hearing due to bias and prejudice on the part of the ALJ. As

-54-

evidence of this unfairness, St. Anthony cites the ALJ's examination of witnesses, alleged predisposition regarding relevant facts, and procedural rulings.

"Due process entitles an individual in an administrative proceeding to a fair hearing before an impartial tribunal." Roach v. Nat'l Transp. Safety Bd., 804 F.2d 1147, 1160 (10th Cir. 1986); see 5 U.S.C. § 556(b); Withrow v. Larkin, 421 U.S. 35, 46 (1975). "However, a substantial showing of personal bias is required to disqualify a hearing officer or to obtain a ruling that the hearing is unfair." Roberts v. Morton, 549 F.2d 158, 164 (10th Cir. 1976). In Liteky v. United States, the Supreme Court observed that a presiding judge may, consistent with due process, be "exceedingly ill disposed towards [a party] who has been shown to be a thoroughly reprehensible person." 510 U.S. 540, 550–51 (1994). Such a judge is not recusable for bias or prejudice "since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." Id. at 551. On the other hand, the Liteky Court also observed that there may be circumstances in which unfair bias or prejudice may stem from knowledge gathered from the adjudication itself. "A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair

-55-

judgment." Id. With this understanding, we examine St. Anthony's claim.

1.      Examination of Witnesses and Alleged Establishment of Evidence on Behalf of the OIG

St. Anthony cites various portions of the hearing transcript in which the ALJ examines witnesses, claiming that such examination proves that the ALJ was biased or prejudiced against it. This contention is without merit in light of 42 C.F.R. § 1005.4(b)(9), which grants the ALJ the power to examine witnesses. In addition, the questioning cited by St. Anthony does not evidence prejudice or bias. We quote the following exchange between the ALJ and Dr. Spengler, cited by St. Anthony as evidence of the ALJ's prosecutorial posture, as an example:

> THE WITNESS: . . . [I] became extremely concerned that [R.M.] wasn't doing well at all, and so I said, Let's get him back into the room. . . .
> JUDGE KESSEL: You said when you looked at him, you became extremely concerned.
> THE WITNESS: Right.
> JUDGE KESSEL: Was it some sort of instantaneous—
> THE WITNESS: Well, exactly. You pull down—I pulled down the sheet and just kind of gave him the once-over, and he was extremely cyanotic and mottled from about what we call the umbilicus, the belly button, down.
> JUDGE KESSEL: All right. What does the word "cyanotic" mean?
> THE WITNESS: Lack of oxygen; pale, kind of mottled, purple, blue, palish, you know, lack of oxygen looking type skin.
> . . .
> So they got him back out; we got him in the room. The lights were on. I throw off the sheet; obvious aortic injury. There was no doubt about it. So I got the nurses going. We hung some normal saline, which is the initial part of resuscitation when somebody's blood pressure's low.
> JUDGE KESSEL: You said it was an obvious aortic injury.
> THE WITNESS: Yes.

JUDGE KESSEL:  No doubt about it in your mind.
THE WITNESS:  No doubt.
JUDGE KESSEL:  What was it about the patient that you saw that led you [to] believe that?
THE WITNESS:  Well, he had no sensation from the umbilicus down.  I couldn't find a pulse in either femoral artery or in the feet.

(Admin. R. App. F at 345–47.)

2.  Predisposition Regarding Relevant Facts

St. Anthony claims that the "ALJ decided before hearing all of the evidence that Mediflight could fly to SAH, thus eliminating a major defense of SAH[.]  A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing."  (Petitioner's Br. at 28–29 (citation omitted).)  This claim is without merit.  The following portion of the transcript is cited by St. Anthony:

JUDGE KESSEL: Well, I'm going to allow the questions.  It's going to take some convincing, Counsel, to satisfy me that the absence of a contract between Medi-Flight and St. Anthony Hospital was a legitimate reason to decline accepting RM, if, in fact, St. Anthony Hospital declined to accept RM.
And the reason for that is that, first of all, this witness has testified already under oath that he's confident that he could have flown the patient to St. Anthony's Hospital, if that, in fact, had been what was necessary.
Secondly, St. Anthony's Hospital, the testimony is, is located very close to or nearly adjacent to other hospitals in Oklahoma City, so he could have flown to—arguably flown to University or Presbyterian, and they could have put RM on an ambulance and driven him over to St. Anthony, if, in fact, St. Anthony had accepted the patient.
So I'll allow the questioning, but I guess I'm signaling my skepticism that the absence of a contract between St. Anthony and Medi-Flight would have been an impediment, such as to justify St. Anthony not accepting RM.

(Admin. R. App. F at 472–73.)  Later, the ALJ stated:

Well, let me explain to you why I don't think it's relevant.  And, again, the parties are free to try to persuade me otherwise in their

post-hearing briefs.  But here's the point.

I don't think that St. Anthony Hospital can use the absence of a contract with Medi-Flight as a basis for denying acceptance of a patient.  Now, it might be that if St. Anthony's medical staff had said, Yes, we can treat this patient, and then had discovered that Medi-Flight, for whatever reason, was unable to fly to the hospital, that would be a basis for the hospital saying, Sorry, we can't do it.

But I think we've got the cart before the horse here.  What—at least on first impression, the question becomes whether the staff of the hospital was ready, willing, and able to treat the patient.  If, in fact, they were, then the next step would have been to find out whether or not they could get the patient there.

. . .

[T]he fact that they don't have a contract and that, as a result of not having a contract, that would be potentially a problem in having Medi-Flight come to the hospital, in my opinion is not really all that relevant.

(Id. at 483–84.)  In our view, these portions of the transcript do not amount to the substantial showing of personal bias required in order for us to rule that the hearing was unfair.  The comments do not evidence reliance on extrajudicial information nor do they "display clear inability to render fair judgment."  Liteky, 510 U.S. at 551.

3.      Procedural Decisions

Finally, St. Anthony argues that the ALJ's rulings on a number of procedural issues demonstrate that the proceedings were tainted with prejudice and bias.  We have carefully reviewed the administrative record and conclude that this argument is without merit.  As the Liteky Court observed,

judicial rulings almost never constitute a valid basis for a bias or partiality motion.  In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved.

-58-

Id. at 555.  We are unable to conclude that these rulings display a clear inability by the ALJ to render fair judgment.

## VIII

Having reviewed St. Anthony's petition, we **DENY** its request for modification or setting aside of the agency's determination.  St. Anthony's motion for costs and attorney's fees is **DENIED**.